PONDER, Justice.
The plaintiff brought suit against the defendant seeking to be decreed the owner of a house and lot located at 5535 South Claiborne Avenue in the City of New Orleans and in the alternative for an accounting from the defendant for sums she had advanced to the defendant for the purchase of the property. It appears that $5,000 was paid for the lot, and the house thereon cost approximately $14,000 when it was erected in 1939. The basis of plaintiff’s suit was that she owned the property and title to it was placed in the name of the defendant with the understanding that he would transfer the property to her after the house was erected. She sought to establish her position by interrogatories on facts and articles addressed to the defendant. The defendant denied her ownership o'f the property and, after various exceptions urged by him had been disposed of, an answer was filed. On trial of the case, the lower court rejected the plaintiff’s demand to be decreed the owner of the property and gave ’her judgment on the alternative demand for an accounting for the sum of $15,955.17, less a credit of $100, with legal interest from judicial demand. The defendant has appealed.
We have omitted stating all the pleadings in this case for the reason that only a question of fact is presented on this appeal, viz.: whether or not the plaintiff advanced the amounts claimed by her to the defendant for the purchase and maintenance of the property and expenses paid in connection therewith.
It appears that the plaintiff became acquainted with one Macrino Trelles, a wealthy man, sometime around 1924 or 1925 and that there developed an intimate relationship between them. He became a frequent visitor to the apartment where she and her daughter, Ursula, resided. The defendant, who had been attentive to her daughter for some time, met Trelles through the plaintiff and her daughter in the year 1935. It appears that thereafter the defendant was a visitor in the plaintiff’s apartment at times when Trelles was present. The defendant was with Trelles on other occasions, most frequently when the plaintiff was present. The plaintiff, over a period of years, served as a dental assistant and for a time, from 1931 until 1938, managed a plantation for Trelles at Newton, Mississippi, for which she received no compensation. She retained her position as dental assistant while managing the plantation. She made trips to Mississippi looking after the affairs of the plantation, *58 which was leased to a tenant on shares, attended to the upkeep of the property and directed the planting of tung trees thereon. She kept the records, collected the rental-share of the crop and attended to all the finances derived from or expended on the property.
The plaintiff testified in effect that sometime in the early part of the year 1939 her landlord informed her that he was going to sell the premises where she had her apartment. Her lease of the apartment would expire on September 30, 1939. She brought this fact to the attention of Trelles and he advised her to look around and see what she could find in the way of a house. Trelles agreed to give her $10,000 for that purpose. She and the defendant, who was then engaged to her daughter, and her daughter inspected a number of houses. After looking at a number of houses, the defendant suggested that she purchase a lot and build a house. He suggested to her that, as he had worked with his cousin, who was a contractor, and knew all the entrees and about building materials, he could handle the matter 'for her and see that she saved money. She was working at that time until late hours in the afternoon. When the matter was taken up with Trelles, he agreed to give her the money for the purchase of the lot and part payment on the house. The plaintiff states that she agreed to let the defendant purchase the lot in his name and to attend to all the matters connected with the erection of the house, with the understanding that he would transfer the property to her within three to six months after the house was completed. After the lot had been selected, the defendant informed her, “We are going to pass the act of sale and will you ask Trelles for the money?” He suggested that the check be made in his name and that he deposit it to his account and give his personal check for the payment of the lot in order that it would not appear 'from where the money came. She contacted Trelles the next day at his office and he came to her place and gave her a check for either $5,000 or $6,000, in fact it was $6,000. She thought at the time she filed the suit, some eleven years after the transaction had taken place, that the two checks representing the $10,000 were in the amount of $5,000 each, but she later ascertained that one was for $6,000 and the other $4,000. She states that the $6,000 was made payable to cash and that she took it to the American Bank and purchased a cashier’s check drawn upon a New York Bank Exchange payable to the defendant. Prior to or at the time of the completion of the house, the defendant informed her that he needed the balance of the money which she was to get from Trelles. She contacted Trelles and secured a check payable to cash in the amount of $4,000 with which she purchased a cashier’s check payable to the defendant. When the house was near completion, the plaintiff and her daughter moved in and occupied it on the 29th or *60 30th o'f September, at which time her lease on the apartment had expired. It appears that at this time the defendant was engaged to the plaintiff’s daughter but no definite time had been set for their marriage. At that time the defendant was receiving $40 per week and expenses and he was having to assist his mother who was ill. The defendant did not know then when he would be financially able to support a wife. After the plaintiff and her daughter moved into the house, she had the property landscaped, she paid the monthly installments on the mortgage given on the property to secure the funds necessary, to pay the balance due for the construction of the house. The telephone was in her name. Sometime in October 1940 the defendant and plaintiff’s daughter were married and he moved into tbe house in November, thereafter. The plaintiff testified that she did not charge the defendant any rent until his mother died the following year and from there on the defendant paid $40 a month rent. The plaintiff continued to pay the installments on the mortgage, the light, gas, water, telephone bills, except for long distance calls made by the defendant, the taxes and the insurance premiums on the house until the year 1945 when she states she stopped paying these because the defendant had not transferred the title to her. She states that she had made repeated demands on him to do so and he had continually avoided transferring the property giving various excuses for not doing so. Trelles continued to visit the plaintiff from the time she occupied the house until he bet ne ill in 1944. The parties continued to live in the house until the defendant ordered the plaintiff to leave the premises on November 2, 1948. The defendant and his wife have lived separate and apart since shortly thereafter.
The plaintiff’s version as to what transpired is corroborated by the testimony of her daughter. She is also corroborated by the testimony of Trelles, which was taken at his home by interrogatories because he had been confined for some time to his home on account of illness. Trelles testified that he gave the money to the plaintiff for services she had rendered. He emphatically denied several times in his testimony that he gave the money to the defendant. His testimony corroborates the testimony of the plaintiff in that the defendant was to transfer the property to the plaintiff when the house was completed.
The defendant’s testimony is to the effect that Trelles advanced him the $10,000 without any strings attached to it because of the close friendship existing between them and in order to secure a home for him and his fiancee. He testified that the check for $6,000 was given to him by Trelles in front of the bank on the day it was executed. He states that the second check for $4,000 was deposited to his account while he was out of the state. The endorsement on this check is in the handwriting of the plaintiff and it would appear that she deposited it to the credit of the defendant. The defend *62 ant testified that the plaintiff agreed to pay in lieu of rent the monthly installments on the mortage, the insurance, the taxes and the cost of landscaping, etc. The defendant offered in evidence the deed and mortgage which were executed in his name.
The fact that the house was erected at a time when its completion would coincide with the expiration of the plaintiff’s lease on the apartment and that she and her daughter immediately took possession of it is significant and appears to corroborate and fit in with the plaintiff’s testimony. The defendant at that time was living with his mother and did not move into the house for more than a year thereafter when he married the plaintiff’s daughter. The defendant’s testimony as to the affection and close relationship between himself and Trelles is not borne out by Trelles’ testimony. It does not appear that Trelles rendered any financial aid to the defendant, prior to his marriage to the plaintiff’s daughter, other than signing a continuing guarantee to secure the payment of $633.83 borrowed to purchase a car. This guarantee was obtained by the plaintiff’s daughter for the defendant.'
It appears that Trelles was suffering from diabetes and that his legs became so weak that he was confined to his home. He had been confined to his home some three or four years when this suit was tried. When the defendant was asked if he had visited or contacted Trelles during his illness, he admitted that he had not. He stated that he, on two occasions, inquired of the person who had acted as Trelles’ chauffeur about Trelles. He stated that on one of these occasions he happened to meet this person at a garage. The reason he gives for not visiting Trelles is because he became embarrassed over an incident which occurred when he took Trelles home in an intoxicated condition. His explanation of this incident is as follows: when he arrived at Trelles’ home, Trelles opened the door of the car and fell between the curbing and the car; that he did not get out and assist him because he was aifraid the car would roll over him; that Trelles’ wife came out of the house and said to him, “You fool, why don’t you get out of that car and help' him?” and that he informed her that he was sorry and assisted her and another woman in getting Trelles to his bedroom. The mere fact that he might have been embarrassed because of this incident would not prevent him from visiting Trelles, if he had so desired. But be that as it may, he made no attempt to see if he would be welcomed or net.
The defendant malíes much of discrepancies in the plaintiff’s testimony. We find discrepancies in the defendant’s testimony also. At the time this suit was filed, the plaintiff was 58 years old and she was testifying to what had transpired some eleven years prior thereto. Necessarily there would be discrepancies in some of the details. However, she was correct as to the amount given her as being $10,000 and *64 that it was represented by two checks. She could reasonably have been in error as to the first check being in the amount of $5,000 because the lot purchased cost $5,000. But be that as it may, Trelles, who furnished the money, emphatically states that he gave it to the plaintiff and emphatically denies that he gave it to the defendant. It would appear to us that there was no necessity for Trelles, a man of varied business interests, to go to the trouble of acquiring cashier’s checks if he had intended to give the money to the defendant. He would have simply issued him his personal checks. Insofar as plaintiff was concerned, there is a reasonable explanation why the transaction was handled in this manner. Another significant fact is that after the defendant moved into the house the plaintiff continued to have possession of two of the bedrooms, one for her own use and one for her guests. The defendant and his wife occupied the other bedroom. The evidence shows that plaintiff entertained lavishly in the home.
 Talcing into consideration all the evidence in this case, we are convinced that the money was given to the plaintiff as her property. After plaintiff moved into the house, she performed all the acts of an owner. She landscaped the property, paid the mortgage installments, the taxes and insurance until sometime in 1945 when she states that she ceased to do so because the defendant refused to transfer the title. She continued to live on in the house until 1948, after she had stopped paying these bills. Since she cannot be given title to the property because she had no counter letter and defendant denied her ownership under interrogatories on facts and articles, she is entitled to recover the $10,000, the payments made by her on the mortgage, the cost of landscaping the property, the insurance premiums, taxes and electrical repairs and fixtures and one-half of the services for telephone, water, light and gas which was used to accommodate all who lived in the house. We could not be warranted under the facts and circumstances in this case in setting aside the judgment of the lower court especially since the credibility of the witnesses is an important factor in the determination of the cause. The evidence as to what caused the strained relationship between the parties, involved herein, since 1938 is conflicting. Whether or not the strained relationship culminated from the refusal of the defendant, after repeated demands, to transfer title to the property to the plaintiff or whether it was brought about because of a disagreement between the defendant and his wife and mother-in-law over what church his child should attend is immaterial.
The judgment should be corrected as to the miscellaneous items allowed, viz.: telephone, water, light and gas bills amounting tO' $1,114.08. It would appear that since all the parties had the benefit of these services the cost of them should be divided equally between the defendant and the *66 plaintiff and that the judgment should be reduced $557.04, by allowing defendant credit for this amount.
For the reasons assigned, the judgment is amended by giving the defendant an additional credit of $557.04. As thus amended, the judgment is affirmed.
FOURNET, C. J., dissents and assigns reasons.
HAWTHORNE, J., dissents.